IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Carolyn Elaine Unger, | ) | Civil Action No. _____ |
| | ) | |
| Plaintiff, | ) | **COMPLAINT** |
| | ) | **(JURY TRIAL DEMANDED)** |
| vs. | ) | |
| | ) | |
| Furman University, | ) | |
| | ) | |
| Defendant. | ) | |

This is a civil suit brought under the Fair Labor Standards Act of 1938, 29 U.S.C. § 201, *et seq*. ("FLSA") for Defendant's failure to pay Plaintiff overtime as required by the FLSA; for Defendant's retaliatory conduct in violation of the FLSA; and Defendant's violations of the South Carolina Wage Payment Act, S.C. Code Ann. § 41-10-10, *et seq*. Plaintiff complains as follows:

**PARTIES, JURISDICTION, AND VENUE**

1. Plaintiff, Carolyn Elaine Unger, is a citizen and resident of Greenville County, South Carolina.

2. Furman University is a private, not for profit university located in Greenville County, South Carolina.

3. Venue is proper in this district and division because it is where Defendant has conducted substantial and continuous operations and it is where the events, including Defendant's unlawful labor practices and policies giving rise to Plaintiff's claims, were committed.

4. This Court has jurisdiction over the Plaintiff's claims brought under the FLSA pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 216(b). This Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over Plaintiff's pendent claims brought under the laws of the State

of South Carolina because those claims arise out of the same transaction or occurrence as the federal claims.

## FACTUAL BACKGROUND

### A. Unpaid Compensation

5. Effective December 9, 2020, Mrs. Unger retired from her position as an Furman University employee after thirty years of service to the school.

6. At all times relevant to this Complaint, while employed by Furman, Mrs. Unger worked within the Furman University Development Office as a full-time hourly employee, not exempt from the requirements of the FLSA regarding overtime compensation. She typically received pay for 40 hours per week.

7. At all periods relevant to this Complaint, Mrs. Unger was assigned regularly scheduled work hours by Furman University in the Development Office (typically 8 AM to 5 PM, with a break for lunch), Monday through Friday.

8. The primarily responsibility of the Development Office at Furman is raising funds to support Furman programs.

9. At the time of her retirement in December 2020, and for several years prior, Mrs. Unger was employed as an "Executive Assistant" in the Development Office. In this capacity, she reported directly to the Vice President for Development.

10. On or about July 2, 2018, Heidi Hansen McCrory assumed the position of Furman's Vice President for Development.

11. Before Ms. Hansen McCrory assumed the position of Vice President for Development, the job had been in a state of flux for some time. Ms. Hansen McCrory's predecessor, Michael Gatchell, took a leave of absence from roughly March 2017 through September 2017. When he returned in September 2017, he was quickly re-assigned to another

position within the University, outside of the Development Office. During this period of Mr. Gatchell's regular absence from the Development Office, Shon Herrick, an associate Vice President within the Development Office, performed the duties of Vice President of Development on an interim basis.

12. While Furman's Development Office was operating without a full-time Vice President for Development, Mrs. Unger was tasked by the University to leverage her extensive institutional knowledge and experience in support of the Development Office. She worked hand-in-hand with Mr. Herrick to ensure that Furman Development's office succeeded in its mission of supporting the University. During this period she worked many hours, including overtime for which she was not lawfully paid, including many nights, weekends, and holidays.

13. Even upon Ms. Hansen McCrory's eventual arrival to the University on or about July 2, 2018, Mrs. Unger continued to work many hours for which she was not lawfully paid overtime.

14. It was not just the absence of a full-time, permanent Vice President in the Development Office that caused Mrs. Unger to take on additional duties necessitating additional work hours.

15. For example, until in or around June 2018, Kerri Brison served as the "Director of Prospect Research" (a senior salaried position) within the Furman Development Office. After in or around June 2018, she was still employed by Furman, but worked off-site for several months leading up to the conclusion of her employment by the University. Ms. Brison's employment with Furman terminated in late-2018.

16. In Ms. Brison's absence, Mrs. Unger was tasked with handling functions of Ms. Brison's work, primarily in the area of "Principal Prospects" (an individual or organization who

the University felt might have significant means to make transformational or highly significant donations or gifts to the University).

17. Despite Mrs. Unger's official classification as an hourly "Executive Assistant," Mrs. Unger provided significant management and administrative support to the Principal Prospect program – efforts previously undertaken by a full-time salaried employee. Her work included providing regular updates to senior Development Office and University leaders; drafting and reviewing correspondence and task lists; and attending substantially all meetings related to the Principal Prospects effort.

18. In or around the Spring of 2020, Furman hired Ms. Teresa Pezdek as the "Director of Prospect Development" – a full-time salaried position. Upon Ms. Pezdek's arrival to the University, Mrs. Unger's supervision tasked her with turning over her prior Principal Prospect responsibilities to Ms. Pezdek.

19. Moreover, during all periods relevant to this Complaint, the Furman University Development Office utilized an electronic timecard system, not inherently linked to an employee's actual arrival or departure time to or from the Development Office.

20. However, the Furman Development Office did utilize a security system that logged the times the alarm was armed or disarmed – and which employee armed or disarmed the building's security system. Upon information and belief, the Development Office's security system from in or around January 2018 forward will show that regularly, Mrs. Unger was the first person to arrive at the building, or in other cases, the last person to leave.

21. Upon information and belief, this same system will indicate Mrs. Unger traveled to the Furman Development office on many weekends or holidays. On many such occasions, Mrs. Unger would travel to the Furman Development Office (a few minutes from her home) to

undertake work at the direction of her supervision or retrieve her Furman-issued laptop so she could work from home. She also routinely responded to after-hours or weekend telephone calls, text messages, and e-mails from her supervision or other senior leaders within the Development Office via her telephone.

22. Mrs. Unger's after-hours and weekend work on behalf of Furman was very evident to her supervision and other senior staff at the University. However, her after-hours and overtime work was often unpaid. Moreover, her leadership never encouraged her to seek overtime pay.

23. Instead, in or around February 2019, Mrs. Unger went to Ms. Hansen McCrory and complained to her that she had been working many hours of overtime; that she was not receiving full pay for all of the work that she was performing on behalf of the University; and that she could not continue to work as much overtime without being properly paid.

24. In response, Ms. Hansen McCrory stated to the effect that she was aware that Mrs. Unger was working many hours of overtime and that Ms. Unger should submit her timecards to reflect the hours she actually worked.

25. During this conversation, Ms. Hansen McCrory did not offer to reimburse Mrs. Unger for unpaid work that had already been undertaken by Mrs. Unger.

26. Mrs. Unger followed Ms. Hansen McCrory's direction and began to submit her time cards to include overtime work hours.

27. However, in or around September 2019, Ms. Hansen McCrory approached Mrs. Unger's desk and informed her, in a hushed tone, that she could not continue to pay her "10 to 12 hours" per week overtime and instead could "only afford 3 to 4 hours" or words to that effect.

28. After this conversation, Mrs. Unger continued to work overtime in excess of 3–4 hours per pay period, but was not fully compensated for her overtime efforts.

29. Subsequently, in or around early-November 2019, Ms. Hansen McCrory remarked to Mrs. Unger, "we have you finally not working 80 hours a week" or words to that effect. Mrs. Unger memorialized this statement, via a contemporaneous e-mail, which is appended hereto as **Exhibit A**.

### B. *FLSA Retaliation*

30. Shortly after Ms. Hansen McCrory assumed the Vice President of Development position in or around July 2, 2018, Mrs. Unger informed her that she had reached the highest pay possible within her Furman pay grade and was interested in a potential promotion to a more senior, salaried position. As background, Mrs. Unger's position description for her role as an "Executive Assistant" within the Development Office had last been updated at some point in or around 2006. In the intervening period, the position description had become stale and did not encompass the duties Mrs. Unger regularly performed on behalf of the Furman Development Office.

31. In or around the Spring of 2019, once Ms. Hansen McCrory became more firmly established in the Vice President position, she and Mrs. Unger again discussed the potential of promotion for Mrs. Unger. Ms. Hansen McCrory agreed that Mrs. Unger had earned and was entitled to a promotion, and Ms. Hansen McCrory agreed to assist Mrs. Unger in getting promoted.

32. To gain a promotion, Ms. Hansen McCrory developed a plan to re-draft a position description for Mrs. Unger and hire an administrative assistant to report to Mrs. Unger. If Mrs. Unger supervised another employee, Ms. Hansen McCrory explained, it would (a.) make approval of Mrs. Unger's promotion more likely, and (b.) help lighten Mrs. Unger's heavy workload.

33. However, the plan subsequently changed. In or around September 2019, Ms. Hansen McCrory stated that the plan of promoting Mrs. Unger in the fashion Ms. Hansen McCrory

proposed was "against policy." As such, Mrs. Unger did not receive a promotion or an increase in her pay.

34. In truth, though, the motivating factor for Ms. Hansen McCrory's denial of a promotion for Mrs. Unger was because, as referenced above, Mrs. Unger had previously exercised her rights under the FLSA by bringing Furman's failure to pay her overtime to the attention of Ms. Hansen McCrory in or around February 2019.

35. While several months had elapsed between Mrs. Unger's complaints and Furman's decision to (a.) stop paying her adequate overtime pay, and (b.) deny her a promotion opportunity, events over the course of the late-Summer of 2019 made Furman more concerned about the issue of overtime pay for hourly, non-exempt employees within the Development Office.

36. On August 26, 2019, another hourly, non-exempt employee within the Furman Development office, Mary Duggan, through her counsel, wrote to Furman, generally stating to the effect that "Mrs. Duggan ha[s] not been paid for many of the hours she had worked" in violation of the FLSA. *See Duggan v. Furman University*, Case No. 6:20-cv-00206-DCC, ECF No. 1, ¶ 22 (D.S.C.); *Id.* at ECF No. 7, ¶ 22 (Furman's Answer admitting these allegations). Mrs. Duggan's lawsuit also alleges subsequent acts of retaliation in response to her complaints over the course of late-2019 and 2020.

37. At the time Mrs. Duggan made her complaints known to Furman in August 2019, (and for many years prior) Mrs. Unger and Mrs. Duggan had a close professional and personal relationship. This friendship was well known to Furman University Development Office leadership. At the direction of Furman, these two individuals would often work closely together on professional projects and could regularly be seen socializing or attending lunch together on campus.

38. Given this close relationship between Mrs. Duggan and Mrs. Unger, Mrs. Unger's prior complaints of not receiving lawful amounts of overtime pay took on renewed relevance to the University when Furman received the letter from Mrs. Duggan's counsel in August 2019.

39. When Mrs. Duggan made her complaints about inadequate overtime pay known to Furman in August 2019, Furman was already well aware that it had, for many years, not been paying Mrs. Unger adequate overtime pay and that just a few months earlier, Mrs. Unger had complained about inadequate overtime pay. When Mrs. Duggan made her complaints to the University, Furman feared Mrs. Unger might likewise act on her prior complaints, retain counsel, and expose the University to additional liability under the FLSA.

40. In an effort to dissuade Mrs. Unger from exposing Furman to additional liability under the FLSA, Furman elected to retaliate against and punish Mrs. Unger for exercising her rights under the FLSA by (a.) denying her overtime pay that she had rightfully earned; and (b.) as stated above, denying her a promotion on pretextual grounds of it being "against policy."

41. While Furman's retaliatory actions, might, at first blush, seem counterintuitive, at the time Mrs. Unger was denied a promotion in or around the late Summer or early-Fall of 2019, she had already logged nearly 29 years of service to the University. The University was well aware that Mrs. Unger was close to the thirty-year threshold necessary for Mrs. Unger to receive full retirement benefits – which included continuing healthcare benefits for her and for her family. In other words, these retaliatory acts by Furman were an implicit threat to Mrs. Unger that the University was not afraid to play "hard ball" (even in the face of Mrs. Duggan's complaints) and that Mrs. Unger would be jeopardizing her position at the University, and thus, her retirement benefits by acting on her prior complaints of inadequate overtime pay.

42. Further demonstrating the pretextual nature of Ms. Hansen McCrory's and Furman's retaliatory decision to deny Mrs. Unger a promotion, in or around September 2019, Furman promoted Lindsey Copeland, who had previously worked as an hourly, non-exempt employee within the Development Office, to a salaried "Assistant Director" position within the Development Office, and an administrative assistant began to report directly to her. In essence, what Ms. Hansen McCrory had said was "against policy" for Mrs. Unger was exactly what occurred for Ms. Copeland.

43. Mrs. Unger' excellent service on behalf of the University is perhaps best summarized by Ms. Hansen McCrory's own words in an e-mail sent to the Development Office announcing Mrs. Unger's retirement in December 2020, set forth in relevant part below:

> Dear Team,
>
> This is a bittersweet bit of news. With joy for her and sadness for us, I am writing to let you know that Elaine Unger is retiring from Furman after 30 years of service. Elaine has been central to most aspects of our work in Development since she joined our division. Prior to coming to the Development Office, she worked in University Housing and Conference and Event Services. As the Executive Assistant to the Vice President and Associate Vice President, Elaine has efficiently and deftly supported a true cast of characters, including more than a handful (figuratively and literally) of different vice presidents and associate vice presidents and so many more of our colleagues over the years. Her talents in project management, budgeting and organization have made her an indispensable member of our team. She has been our central person on Board of Trustees and committee work, campaign preparations, the Professional Development Committee, The Conversation, scheduling, travel, the budget, and much, much more. She has developed long lasting, important relationships with Furman's alumni and donors over the past three decades. Her contributions to this department and to the University are too numerous to name. A graduate of Furman, she is also the parent of an alumnus, her son Cliff, who graduated in 2019. At her request, we are delaying any celebration of Elaine and her accomplishments until we can reasonably gather in person next spring or summer. Until then, please join me in thanking Elaine for all of her extraordinary service to us and to Furman, and in wishing her a peaceful, joyous retirement.
>
> . . .

44. Furman´s retaliatory acts demonstrably, directly, and proximately result from Mrs. Unger's complaints that Furman was violating the FLSA and other laws.

### C. *Willful Violation of the FLSA*

45. Unfortunately, Furman has made it a systematic practice to deny non-exempt, hourly employees within the Development Office all of the wages they are entitled to under the law – particularly those employees, like Mrs. Unger, officially categorized as administrative or assistant staff by Furman.

46. For example, as early as June 2013, the minutes of Furman's "Staff Advisory Committee" reflect that due to a "coding error" facilities employees, such as "plumbers," could receive overtime pay, but not "department assistant[s]."

47. As another example, in or the Spring or early-Summer of 2016, Furman held a "Department Assistants" meeting that Mrs. Unger attended. At this meeting, Kristin Davis, an Employee Relations Manager within the Furman Human Resources Department, spoke and answered questions from Furman employees working in the development office in administrative or assistant capacities.

48. During this open setting, another employee present remarked in front of the assembled group that it was her personal experience as well as her understanding that all the "administrative assistant" employees at the meeting were consistently working more than 40 hours per week. Instead of inquiring into the circumstances of this employee's complaints, Ms. Davis reacted to this statement by feigning apparent shock, covering her ears, and telling the attendees that they needed to inform their supervisors about this.

49. Upon information and belief, when the concerns raised about overtime during this meeting were subsequently brought to the attention of senior leadership within the Development Office, Furman took no substantive steps to address them.

50. Furman also made it a practice to regularly ask hourly, non-exempt Development Office staff, including Mrs. Unger, to "volunteer" for after-hours events that had a direct relationship to the Development Office's goal of raising funds to support Furman University. For example, Mrs. Unger and other similarly situated employees within the Development Office were tasked by Development Office supervision to make evening phone calls to prospective donors to the University. For these efforts, Mrs. Unger and other hourly, non-exempt employees were often not appropriately or adequately paid under the law.

51. From before January 2018 and forward, Mrs. Unger has firsthand knowledge of other employees within the Development Office working many overtime hours. These employees were not fully or lawfully paid, with full knowledge of senior leadership within the Furman Development office.

## FOR A FIRST CAUSE OF ACTION
**(Violation of FLSA – Failure to Pay Overtime Wages)**

52. Plaintiff incorporates the foregoing by reference.

53. During the time relevant to this Complaint, Plaintiff "engaged in commerce or in the production of goods for commerce" as that term is defined by the FLSA.

54. At all relevant times, Defendant was Mrs. Unger's employer, as that term is defined under 29 U.S.C. § 203(d).

55. Plaintiff worked more than forty hours per week without being compensated at a rate of one-and-one-half times her regular rate of pay for all hours over forty per week, as required under 29 U.S.C. §207(a).

56. Defendant's violations of the FLSA were intentional, knowing, and willful.

57. Plaintiff is entitled to unpaid overtime compensation at the rate of one-and-one-half times her regular rate of pay for all hours worked over forty hours in a workweek, liquidated damages in an equal amount, and her reasonable attorney's fees and costs in bringing this action pursuant to 29 U.S.C. §216(b).

## FOR A SECOND CAUSE OF ACTION
**(Violation of FLSA – Retaliation and Reprisal)**

58. Plaintiff incorporates the foregoing by reference.

59. Mrs. Unger's complaints regarding her unpaid work to her supervision alleging *inter alia* FLSA violations were protected activities under the FLSA.

60. As a direct and proximate result of some or all of these activities, Defendant "discriminated" against Mrs. Unger as that term is defined at 29 U.S.C. § 215(a)(3), by engaging in willful, malicious, and reckless, discriminatory, retaliatory, and materially adverse actions to deter and retaliate against Mrs. Unger for exercising her rights under the FLSA and other laws.

61. Furman's foregoing conduct has directly and proximately caused Mrs. Unger damages, including emotional distress.

62. As a result, Plaintiff is entitled to compensatory and punitive damages, in addition to attorney's fees and costs.

## FOR A THIRD CAUSE OF ACTION
**(Violation of South Carolina Wage Payment Act, SC Code Ann. §41-10-10, *et seq*.)**

63. Plaintiff incorporates the foregoing by reference.

64. Defendant agreed to pay Plaintiff, its employee, an hourly wage for the services she rendered at its direction and on its behalf, as her employer, including those services performed outside of the Development Office or regular business hours.

65. Since at least January 2018, Plaintiff worked numerous hours for Defendant for which she has not been paid.

66. Defendant's actions and omissions in failing to pay Plaintiff her wages due were wholly without justification, and violate the South Carolina Wage Payment Act, §41-10-10, *et seq*.

67. As a result, Plaintiff is entitled to three times the full amount of her unpaid wages, plus costs and reasonable attorney's fees.

## CONCLUSION

WHEREFORE, Plaintiff requests a jury trial and judgment awarding her the following:

A. That Plaintiff be awarded her unpaid overtime compensation, plus an equal amount as liquidated damages pursuant to the FLSA;

B. Compensatory and punitive damages pursuant to the FLSA;

C. Three times the amount of unpaid wages due, pursuant to the South Carolina Wage Payment Act;

D. Attorney's fees and costs of this action; and,

E. Such other and further relief as this Court deems just and proper.

Respectfully Submitted,

**CALLISON, TIGHE & ROBINSON, LLC**

*s/Ian T. Duggan*
Richard C. Detwiler, Fed Bar No. 510
Ian T. Duggan, Fed Bar No. 12670
1812 Lincoln St., Ste. 200
P.O. Box 1390
Columbia SC  29202-1390
Telephone No.: (803) 404-6900
Facsimile No.:  (803) 404-6902
RickDetwiler@callisontighe.com
IanDuggan@callisontighe.com

Columbia, South Carolina       **ATTORNEYS FOR PLAINTIFF**
February 5, 2021               **CAROLYN ELAINE UNGER**